## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 14 - 409** |
| **CHAKA FATTAH, JR.** | **:** | |

### ORDER

After consideration of the Defendant's Motion to Quash The Indictment With Prejudice for Perjury Before the Grand Jury And Due To Repeated And Intentional Government Misconduct, and the government's response to the Motion, it is hereby

### ORDERED

that the Motion is denied.

BY THE COURT:

_____

HONORABLE HARVEY BARTLE, III
*Judge, United States District Court*

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 14 - 409** |
| **CHAKA FATTAH, JR.** | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT FATTAH'S MOTION TO
QUASH THE INDICTMENT WITH PREJUDICE BEFORE THE GRAND JURY AND
DUE TO REPEATED AND INTENTIONAL GOVERNMENT MISCONDUCT**

The United States of America, by its undersigned attorneys, Zane David

Memeger, United States Attorney for the Eastern District of Pennsylvania, and Paul L. Gray,

Assistant United States Attorney, responds to Fattah's Motion to Quash The Indictment With

Prejudice for Perjury Before the Grand Jury And Due To Repeated And Intentional Government

Misconduct as follows:

I.      INTRODUCTION

Defendant Chaka Fattah, Jr. has filed a motion to quash the indictment, or

portions of it, based on his unfounded allegations that the government suborned perjury before

the grand jury and repeatedly committed misconduct in the investigation and grand jury

presentation of this matter.  Fattah's motion is without merit and must be denied.[1]

II.     LEGAL STANDARDS

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides:  "The

indictment or the information shall be a plain, concise and definite written statement of the

---

[1] Upon request, the government will gladly provide the Court with the grand jury exhibits and each of the thirty-three grand jury transcripts containing testimony from twenty-four witnesses taken between April 2013 and July 29, 2014, the day Fattah was indicted.  A neutral reading of these transcripts demonstrates that the grand jury presentation was thorough, fair, and complete. The grand jury received evidence demonstrating not merely probable cause, but overwhelming evidence of Fattah's guilt to the charged offenses.

essential facts constituting the offense charged."  Generally, an indictment which merely tracks the language of the applicable statute is sufficient. United States v. Sarbello, 985 F.2d 716, 720 (3d Cir. 1993).  An indictment satisfies the requirements of the Fifth and Sixth Amendments if it informs the defendant of the charges against him and provides enough detail so that the defendant may plead double jeopardy in a future prosecution based on the same set of events. Hambling v. United States, 418 U.S. 87, 117 (1974); United States v. Hodge, 211 F.3d 74, 76 (3d Cir. 2000).

A presumption of regularity attaches to grand jury proceedings.  In re Grand Jury Proceedings, 632 F.2d 1033, 1041 (3d Cir. 1980)  see also  United States v. Capozzi, 486 F.3d 711, 726-27 (1st Cir. 2007)(defense moved for grand jury transcripts to prove the government failed to make adequate showing of interstate commerce; presumption of regularity attaches to grand jury proceedings and courts will not look behind indictment to examine adequacy of evidence; thus the court properly denied motion seeking "proof" of nonjusticiable issue); United States v. West, 549 F.2d 545, 554 (8th cir. 1977).  While it is in theory possible for "outrageous government investigatory conduct" to support dismissal of an indictment, the Third Circuit has recognized that "the viability of the doctrine is hanging by a thread." United States v. Nolan-Cooper, 155 F.3d 221, 230 (3d Cir. 1998).  Accordingly, "courts have rejected [the outrageous investigative conduct doctrine] with almost monotonous regularity." Id., quoting United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) ("The banner of outrageous conduct is often raised but seldom saluted.").  Relief is available for the government's investigative tactics only if "the challenged conduct [is] shocking, outrageous, and clearly intolerable.... This is an extraordinary defense reserved only for the most egregious circumstances." Nolan-Cooper, 155 F.3d at 230-31, quoting United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992).  The dismissal of an

indictment is appropriately reserved "only to 'curb the most intolerable government conduct.'"
United States v. Beverly, 723 F.2d 11, 12 (3d Cir. 1983), *quoting* United States v. Jannotti, 673
F.2d 578, 608 (3d Cir. 1982) (en banc).

      In light of the strict limits applicable to the outrageous government conduct
doctrine, the defendant bears a very heavy burden to substantiate claims of outrageous conduct.
*See* United States v. Voigt, 89 F.3d 1050, 1070 (3d Cir. 1996) (defendants "bear[] both the
burden of production and persuasion on [their] outrageousness claim."). To even warrant a
pretrial hearing, a defendant must "demonstrate a colorable claim for relief." Id. at 1067
(quotation and citation omitted).  In order to be "colorable," a defendant's claim must consist of
more than mere bald-faced allegations of misconduct, but must establish the existence of
disputed issues of material fact.  Id.; *see also* United States v. Al Mundis, 695 F.2d 1182, 1185
(9th cir. 1983); In re Special April 1977 Grand Jury, 587 F.2d 889, 892 (7th cir. 1978).  Fattah has
failed even to establish a colorable claim.

      Fattah's motion is simply a road-map into how Fattah intends to defend his case
and cross-examine some of the witnesses against him.[2]  Whether or not the government will
prove at trial the facts necessary to support a finding that Fattah committed the offenses alleged
in the indictment is immaterial to the analysis to be made here; "[a] ruling on a motion to dismiss
is not...a permissible vehicle for addressing the sufficiency of the government's evidence."
United States v. Bergrin, 650 F.3d 257, 264-65 (3d Cir. 2011) (citations omitted).

      His argument that grand jury witnesses lied and that the government somehow
committed misconduct by "knowingly" allowing this perjured testimony before the grand jury is

---

[2] That defendant has available to him various grand jury transcripts and witness statements which
he has mischaracterized as evidence of perjury only underscores that the government has
complied with its *Brady* and *Giglio* discovery obligations.  *See* United States v. Higgs, 713 F.2d
39, 42-44 (ed Cir. 1983).

based upon a lengthy and selective discussion of grand jury transcripts and testimony which he intends to dispute at trial.  Fattah self-servingly ignores voluminous evidence presented to the grand jury that counters his mischaracterizations.  In any event, "[e]videntiary questions"—such as credibility determinations and the weighing of proof—"should not be determined at th[is] stage." United States v. Gallagher, 602 F.2d 1139, 1142 (3d Cir.1979).  Rather, "[i]n considering a defense motion to dismiss an indictment, the district court [must] accept[ ] as true the factual allegations set forth in the indictment." United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir.1990) (citing Boyce Motor Lines v. United States, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952)).  The trial court should only consider on a motion to dismiss those objections that are "capable of determination without the trial of the general issue."  United States v. Knox, 396 U.S. 77, 83 (1969).

## III.    BACKGROUND

The indictment charges that Fattah schemed to obtain lines of credit from Philadelphia banks for his business entities under false pretenses and by fraud, and by making false statements to the banks, including statements about his business and personal earnings. ¶ 4. The indictment alleges that, in order to persuade the banks to provide the loans, Fattah caused the preparation of a false personal income tax return for year 2004, which falsely claimed that 259 Strategies had gross income of $140,000 and falsely identified expenses totaling $132,400 during 2004.  The return called for a tax payment of $1,125, which Fattah made. ¶ 4a.

The indictment also charges that, contrary to the terms of his loan agreements which required him to use the loan funds for working capital and other business expenses, Fattah used the funds from the business lines of credit primarily for personal expenses, including car payments, food, restaurant and club expenses, utilities, clothing, electronics, retail purchases,

charitable donations, jewelry, entertainment, legal fees, and personal credit card expenses. ¶ 4b. Specifically, Counts One through Seven charge Fattah[3] with a total of seven counts of making false statements to obtain bank loans, in violation of 18 U.S.C. § 1014.  All of these bank loans were in 2005.   Count Twelve charges bank fraud, in violation of 18 U.S.C. § 1344.   Count Thirteen charges Fattah with making false financial statements on a personal line of credit, in violation of 18 U.S.C. § 1014.

The indictment also alleges that after Fattah defaulted on loans, he schemed to settle two of the loans for less than what he owed by supplying false statements concerning his financial status to the banks, to the U.S. Small Business Administration ("SBA"), which had insured the loans, and to a SBA investigator. ¶ 4c.  Counts Eight through Ten charge false statements concerning loans insured by the Small Business Administration, in violation of 18 U.S.C.§ 1001.  The gravamen of these counts is that Fattah attempted to settle his bank loans by supplying false documents to the banks and the SBA in which he claimed that he was currently earning about $2,500 per month and that 259 Strategies, the entity under which name he took out the loans, was defunct.  The indictment charges that at the time he made these false statements Fattah was earning from $6,250 to $37,500 monthly, and at times had received these earnings pursuant to contracts he signed as the President of 259 Strategies. ¶ 4c. Fattah is charged in Count Eleven with providing false financial information during a legal deposition taken in conjunction with a law suit filed against him one of the defaulted bank loan, in violation of 18 U.S.C. § 1014.

Counts Fourteen through Seventeen charge Fattah with filing false federal income tax returns, in violation of 26 U.S.C. § 7206(1), for tax years 2005, 2006, 2008, and 2009.  Count

---

[3] Fattah is charged in Counts Five, Six, and Seven with aiding and abetting Matthew Amato in making false statements to the banks at which Amato applied for lines of credit.

Eighteen charges Fattah with willfully failing to pay the $51,141 tax due on Fattah's reported earnings of $151,808 during 2010, in violation of 26 U.S.C. § 7203.   Fattah has made no allegation in this filing that these counts were obtained through misconduct.

Count Nineteen charges Fattah with theft of government funds, in violation of 18 U.S.C. § 666.  This count involves Fattah's involvement in providing the Philadelphia School District with false budget figures which caused the school district to make excessive payments to Company 1, which held a contract with the school district to provide alternative educational services to Philadelphia school students.  At times, Fattah was the Chief Operating Officer of Company 1.  Counts Twenty through Twenty-Three charge Fattah with wire fraud concerning the transmissions of the false budgetary figures to the school district and also the wire transfer of payments pursuant to Company 1's contract with the school district.

IV.     DISCUSSION

A.     False statements and bank fraud charges.

It appears that Fattah will defend at trial by arguing that he and Amato did have $140,000 in earnings during 2004.  Under his defense theory, Fattah will argue that the 2004 income tax return Fattah had prepared in the name of 259 Strategies, which was used to persuade the banks to provide defendant and his co-conspirator with lines of credit in 2005, was accurate.[4]

---

[4] Fattah admits as much at page 27 of his motion.  In the government's plea memorandum submitted in support of Amato's guilty plea, the government described how Fattah was captured in a tape-recorded conversation with Amato discussing the 259 Strategies income tax return for 2004, during which he said "we took the tax hit (paid the tax) in order to get some lines of credit."  The $140,000 gross income figure was provided in six of the seven lines of credit applications Fattah and Amato made between June and November 2005.  Fattah claimed that "259 Strategies" earned $140,000 in 2004 in his July 1, 2005 line of credit application with PNC Bank; Amato claimed $139,000 in income in 2004 for "CFJA" in his July 12, 2005 application with PNC Bank.  Fattah claimed "259 Strategies" earned $140,000 in income in 2004 on his November 1, 2005 line of credit application with Sun National Bank; and, Amato claimed

Fattah claimed 259 Strategies earned $140,000 in 2004, while his co-conspirator claimed that Chaka Fattah, Jr. & Associates ("CFJA") earned $140,000 in 2004.  Based upon his motion, Fattah also intends to argue that whatever he or Amato "earned," whether under the name "Fattagraphy," "259 Strategies," "CFJA," "American Royalty," or any other source for that matter, could be aggregated to justify Fattah's claim that he earned $140,000 in 2004 as he told the banks.   Fattah's attempt to contest the facts underlying the counts in the indictment is, of course, for the jury to decide, and not properly before the Court in the guise of a motion to dismiss the indictment.   Indeed, "[i]n considering a defense motion to dismiss an indictment, the district court [must] accept[ ] as true the factual allegations set forth in the indictment.  Bergrin, 650 F.3d at 265 (citations omitted).

Fattah's motion simply argues a version of events contrary to the allegations in the Indictment and accuses the witnesses of lying if their grand jury testimony is inconsistent with his defense theory.[5]  His pleading is nothing more than Fattah's outline for cross-examining adverse witnesses.  The accuracy of this testimony, what weight to be given it, and the testimony's relevance to the issue of Fattah's ultimate guilt, all are matters of fact for the jury.

---

$140,000 in income in 2004 for "CFJA" in his application with the same bank three months earlier.

[5] In support of his Motion to Quash, Fattah submitted exhibits, including a copy of a business card identifying Amato as a Vice-President of 259 Strategies.  During the investigation Fattah was served with grand jury subpoenas requiring him to turn over all business records concerning 259 Strategies.  The government received scant production, and did not receive the business card Fattah attached to his pleading, which should have been supplied in response to the subpoena. With the first production of discovery to the defense, the government requested reciprocal discovery from Fattah pursuant to the Rules of Criminal Procedure.  To date, Fattah has provided nothing.

Case 2:14-cr-00409-HB   Document 53   Filed 12/24/14   Page 9 of 25


Moreover, the grand jury testimony simply does not support Fattah's allegations of prosecutorial misconduct.[6]

      B.     <u>Independent basis to deny Fattah's Motion to Quash</u>[7]

        As noted above, in addition to charging Fattah with making false statements to the banks to persuade them to grant him loans and lines of credit, the Indictment also charges that he falsely promised to use the loan funds for working capital and other business expenses according to the express terms of his loan agreements with the banks.  The indictment charges that Fattah instead used the funds provided by the banks primarily for personal expenses, including car payments, food, restaurant and club expenses, utilities, clothing, electronics, and retail purchases. In his motion, Fattah simply ignores the substantial evidence presented to the grand jury demonstrating the use of the lines credit on Fattah's personal expenses.

        Moreover, in addition to Fattah's illegal use of business-loan funds for personal expenses, each false statement count contemplates additional lies that Fattah made to the banks.[8] For example, in his November 1, 2005 application to Sun National Bank, Fattah reported that he

---

[6] In his motion, Fattah discusses in detail Amato's 2007 testimony during his Bankruptcy Court proceedings.  He argues that the prosecutors must have known what Amato told the Bankruptcy Court, which in Fattah's view is inconsistent with what Amato told the grand jury, and therefore the prosecutors must have suborned perjury.  In fact, the government received the disc containing Amato's bankruptcy testimony in October of 2014, three months after Fattah was indicted.  Of course, Fattah assumes that Amato was candid with the Bankruptcy Court, and therefore lied to the grand jury.  Again, any inconsistencies are for the petit jury to resolve.  In any event, the government supplied Amato's bankruptcy testimony to Fattah, as required under the rules of discovery, and Fattah can use it in cross-examination of Amato if he chooses to do so.  It is noteworthy that Amato appeared in Bankruptcy Court in 2007, years before he knew there was a criminal investigation into his activities and before he admitted the crimes he committed with Fattah to federal investigators.

[7] Fattah has not raised a challenge to Count Thirteen, charging false statements to Philadelphia Credit Union, anywhere in his motion.

[8] Each count charged Fattah with making false statements, including specific false statements, by language alleging that "Fattah claimed, *among other things*, that …" (emphasis added).  Thus, every false statement Fattah made to each bank is contemplated by the Indictment.

had $5,000 in credit card debt; the government will show that, at the time, he had closer to

$40,000 in credit card debt.  In addition, Fattah did not disclose to Sun the fact that he had the

outstanding lines of credit at Citizens Bank and PNC Bank which he had taken out earlier in

2005.  Each is a false statement which supports the return of the indictment.  Other similar

statements were made to the other victim banks.

      C.      <u>The Philadelphia School District ("PSD") and the Small Business Administration</u>
<u>("SBA")</u>

         1.      Fattah's Trial Defense

Fattah has also moved to quash the counts concerning the PSD, Nineteen through

Twenty - Three, and the counts concerning the Small Business Administration, Counts Eight

through Ten.  First, he claims that PSD attorney Paul McCarthy and FBI Agent RJ Haag lied to

the grand jury and that the government committed misconduct in presenting the testimony.  In

addition, he argues that the government violated his due process rights and improperly "mixed

two purported parallel investigations" to obtain criminal evidence.  Fattah is wrong on the

investigative procedures taken and on the pertinent law.  We first address Fattah's misplaced

claim concerning the grand jury testimony.

Consistent with his previous method of alleging government misconduct, Fattah

simple identifies facts introduced at the grand jury which he intends to contest.  He then accuses

the witnesses of lying and the government of suborning perjury.  Fattah makes conclusory

statements and factual averments – all of which are inappropriate in a motion to dismiss –

including the following : which of Fattah's contracts with Company 1 were in place at the time

Company 1 submitted the budgets to the school district; whether Fattah should have received

$50,000 of the funds identified to the PSD as "contract services" on the budget, other portions of

which Fattah agreed to pay to a Company 1 marketing employee uninvolved with the Southwest

school; whether the government committed misconduct by not informing the grand jurors of what Fattah claims was the "emergency nature" of the contracts company 1 had with the PSD, which caused the PSD to "reduce everyone's contracts"; that the budgets were not invoices; that the government misled the grand jury about the importance of the budget; how much time Fattah spent at the Southwest school; how the PSD contract was awarded; Fattah's objections to questions put to the PSD about the budget process, and a lengthy dissertation, pgs. 63-66, apparently espousing Fattah's version of when the school opened, how that related to the timing of the budgets, his apparent disagreement with PSD about its reliance on those budgets, and whether the PSD actively audited the expenditure of the Southwest funds by Company 1 and were aware of the school staffing.  All of this is Fattah's defense at trial, cloaked in allegations of misconduct and improperly presented in a motion to dismiss.

     2.       Fattah's Misapplication of <u>Scrushy</u>

          a.       The Small Business Administration

       As noted above, Fattah also claims that the government violated his due process rights and illegally merged its criminal investigation with "parallel" investigations by the PSD and the SBA.  We first address the SBA allegations.  During its investigation the FBI determined that Matthew Amato and Fattah had a relationship, and that both Amato and Fattah had taken out lines of credit in 2005, sometimes at the same banks.   Further investigation led to Amato's admission to the FBI that he had falsely taken out the lines of credit at Fattah's behest and provided the funds to Fattah, and that some of Fattah's loans were insured by the SBA.  Amato cooperated with the FBI investigation, and tape-recorded conversations with Fattah in 2011 during which he and Fattah discussed the lines of credit, and the SBA insured nature of the loans.

The government had Amato supply Fattah with a SBA investigator's contact information.  Fattah spoke to the investigator, who properly tape-recorded the conversation.  During that conversation, Fattah told the investigator that the documents he completed to settle two of his SBA-insured bank loans for less than what he owed were accurate.  Specifically, Fattah referred to SBA forms 770 and 1180.  As noted above, the gravamen of Counts Eight and Nine is that on the forms Fattah claimed that he was currently earning about $2,500 per month and that 259 Strategies, the entity under which name he took out the loans, was defunct.  The indictment charges that at the time he made these false statements, Fattah was earning from $6,250 to $37,500 monthly, and at times had received these earnings pursuant to contracts he signed with Company 1 as the President of 259 Strategies.  Count Ten charges that Fattah made false statements to the SBA investigator when he claimed that the forms he filed were accurate.

Fattah claims that the FBI improperly worked with the SBA, and that the SBA investigation was "not a legitimate parallel investigation."  He relies upon United States v. Scrushy, 366 F.Supp.2d 1134 (N.D. Ala. 2005), which held that the trial testimony of an SEC official should be suppressed, resulting in the dismissal of a perjury account against Scrushy based upon his SEC testimony.   Scrushy knew he was under civil investigation by the Securities and Exchange Commission, by whom he was to be deposed.   Before the deposition, Department of Justice officials were told of possible criminal activity at Scrushy's company, Healthsouth, and that Scrushy was aware of it.  DOJ officials played a role in having the deposition moved to a location more convenient to the SEC official who became aware of the criminal allegations and who asked questions of Scrushy at his SEC deposition that he would not have asked had he not learned about the criminal probe from the DOJ before the deposition.   When the parties became aware of this during the SEC official's testimony at Scrushy's criminal trial, the trial was delayed

pending fact-finding concerning the circumstances of the deposition.  Subsequently, the district court suppressed the SEC official's testimony.

The court ruled that the government departed from the "proper administration of justice" by effectively causing the SEC deposition to be moved to a location where the government would have venue over possible perjury by Scrushy, and by effectively bringing the SEC investigator into the criminal investigation.   A crucial part of the court's decision was its finding that the government manipulated both proceedings to its advantage.

Scrushy is clearly inapposite.  This was not a case of parallel civil and criminal investigations by the SBA and FBI which the government improperly merged, as in Scrushy. This was one criminal investigation by the FBI and IRS which involved the possible falsification of SBA documents.  The participation of the SBA investigator, who is authorized to investigate crimes related to the SBA, is obviously proper.   In fact, Fattah's motion disproves his own argument.  He writes, pg. 72, "Fattah submits that the SBA was not actually conducting a civil investigation into the three SBA guaranteed loans issued to Fattah … but was working with the FBI to get Fattah to make recorded statements that could be used against him."  He is correct; and the government did so legally.  Fattah complains that he wasn't informed by the SBA that he was under criminal investigation, that he wasn't provided documentation, and that he wasn't given his Miranda warnings.  Fattah had no right to know he was under investigation, and the Miranda warnings apply only to persons "in custody."   Fattah was not in custody.

b.      The Philadelphia School District

Fattah also accuses the government of improperly merging its criminal investigation with a "parallel" investigation by the PSD.  In addition, Fattah claims that

statements he made to the PSD were involuntary and made in violation of <u>Miranda</u>.[9] As we discuss below, there was no separate investigation by the PSD.  Moreover, the allegation that he made involuntary statements to PSC is patently absurd, as it was Fattah who called the PSD to report the fraud at Company 1 in return for a possible reward or fee from the PSD.

On February 21, 2012, the Philadelphia School District was contacted through its confidential email site by an individual looking to determine whether the school district would pay a fee or reward to "whistleblowers" who reported fraud pertaining to the school district.  The next day, John Brennan, an investigator with the PSD Office of Inspector General, had a conversation with a person who identified himself as "Chip" who again asked about a reward or fee for identifying fraud in the school district.  The caller said there was fraud in contracts between the PSD and the school identified in the Indictment as Company 1.[10]  Eventually, the PSD identified "Chip" as Chaka Fattah, Jr.  The school district also alerted the government to the calls after the government's execution of search warrants on February 29, 2012, at Fattah's home and work place, where Fattah alleged there was a fraud.  The PSD had no investigation involving Fattah or Company 1at that point, and had no knowledge of what Fattah eventually described as fraud between Company 1 and the PSD.  Fattah's contact eventually led to three

---

[9] They were not. Fattah was not in custody; he made his admissions at the PSD offices.

[10] Apparently, there was more to the issue than Fattah possibly getting a reward.  Fattah's original motivation in betraying his co-conspirator and Company 1 to the school district was to get his partner out of the business because he was intending to start his own alternative education services company, called "Dreamchasers."  Investigators recovered from Fattah's records pursuant to a search warrant a "strategic direction document" created by a Burbank, CA company called Growthink.  The document identified Fattah as President and another Company 1 employee as Educational  Director, along with about 10 teachers and counselors, all to be employed as "Dreamchasers." The company's mission, as described in the document, is exactly the same as Company 1, that is, to target public school districts to secure contracts for "at risk" students to provide individualized academic instruction and behavior modification counseling. Emails accompanying the report show that a final business plan was envisioned by March 22, 2012, about three weeks after the search warrants were executed.  Apparently, execution of the search warrant altered Fattah's plans.

meetings between the school district and Fattah, at which an FBI agent was present.  The agent was identified to Fattah as employee of the school district.  As noted above, the meetings were tape recorded.

Agent Haag testified at the grand jury that during the meetings, Fattah reviewed the PSD budgets submitted by Company and himself and made admissions and provided evidence which incriminated himself in addition to the President of Company 1.  If testimony is taken in this matter, Agent Haag will testify that when he arranged to have the FBI agent inserted into the meetings with Fattah, he expected Fattah to incriminate the President of Company 1, who was familiar to the government for reasons not directly related to the current charges against Fattah.

Fattah claims that his statements were involuntary, apparently because portions of the statements were made after the PSD asked Fattah to clarify some of his allegations, because the PSD asked him for more information and documentation about them, and because the PSD told him that he may receive a reward for his information.  The government is prepared to show that Fattah initiated the conversations with the School District, participated freely, and willingly provided information concerning the fraud upon the school district, likely because he wanted to push Company 1 aside and because he wanted a reward or fee, as he initially inquired of the PSD.   In one of the cases Fattah cites, United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005), the Third Circuit reviewed the various factors to be used to determine the voluntariness of a person's statement: in the totality of the circumstances, is it the product of an essentially free and unrestrained choice; was the individual's will overborne or that person's capacity for self-determination impaired; the person's  background and experience, including dealing with the criminal justice system; and was there coercive police activity and a causal connection between

the police activity and the confession.   The evidence will show that Fattah was more than willing to describe the fraud upon the school district.   At the time he made his voluntary admissions, Fattah simply overlooked the fact that he played a role in the fraud and personally gained from it, likely because he thought he would be rewarded.  But that doesn't make his statements inadmissible.

Fattah's claim that Scrushy rules his contact with the PSD also is similarly misplaced.  Scrushy stands for the proposition that the government cannot manipulate parallel investigations to attempt to gain evidence to be used in a criminal investigation.   In Scrushy, the prosecutors had been informed that Scrushy was involved in criminal activities at Healthsouth, the company about which he would be civilly deposed and about which there was a parallel SEC investigation.  As the court saw it, the criminal prosecutors in Scrushy then manipulated the location of the civil deposition to get venue over the matter if Scrushy said something in his civil deposition which they could possible charge as criminally false statements.  The actual impermissible conduct which caused the suppression of Scrushy's statement was the involvement of the SEC investigator in asking questions during the civil deposition, which he admitted he would not ordinarily have asked, about criminal activity by Scrushy that the government had already learned about and about which the government intended to gather evidence.  The court found that this tactic was a departure from the proper administration of justice.  There was no improper activity here.

The FBI was investigating Fattah for the banking and tax violations identified on the search warrants recently executed.  Neither the prosecutor, nor the FBI, nor the school district before Fattah called them, were aware of any criminal activity concerning any fraud by Company 1on the school district.  The FBI attended the PSD meetings to learn whether there had

been any criminal activity, from which the government would have to determine whether a federal violation was committed and who committed it.  The improper government motive which caused the court's ruling in <u>Scrushy</u> is starkly absent here.  When the FBI sat in on Fattah' s meetings with the PSD, it had no information about or intention to question Fattah about any crime it was currently investigating, unlike the SEC investigator who sat in on Scrushy's civil deposition and questioned Scrushy on matters that the Department of Justice had been told he acted criminally with the intention to gather evidence against Scrushy.   Moreover, the court found that the government in Scrushy manipulated Scrushy's SEC deposition.   The FBI was simply investigating allegations of new criminal conduct, and appeared at the meeting with the PSD and Fattah held to flesh out the accusations Fattah reported to the school district.   Fattah was not compelled to meet with the PSD, unlike Scrushy, who appeared at a legal proceeding scheduled by the government.

Fattah correctly notes that Department of Justice Guidelines concerning the government's contact with represented persons may implicate legal restrictions and the admissibility of the resulting evidence.  He also correctly notes that "if an individual is known to be represented by counsel <u>in a particular matter</u>" (emphasis added), the FBI will follow applicable law and Department procedure." pg.  82.   On the day the government executed the search warrants on Fattah's home, February 29, 2012, we were informed that Fattah was represented by counsel.  At that time, the "particular matter" for which Fattah was under investigation were those offense enumerated in the search warrants served that day: 18 U.S.C. §§ 1344 (bank fraud) and 1001 (false statements); and 26 U.S.C. §§  7203 (failure to file an income tax return), 7206 (filing a false return), and 7201 (tax evasion).   The government had no knowledge of any illegality involving contracts between Company 1 and the PSD, and Fattah

was not "represented" on any such matter.  The government also followed proper procedure and safeguarded Fattah's attorney-client privilege by instructing Agent Hess to avoid all discussion of banking issues and tax issues, the matters for which Fattah was under investigation.  U.S. Attorney's Manual, § 9 - 13.200.  Fattah has not alleged that any such discussion occurred.

Case law supports the government's investigation methods.  It is well settled that undercover recordings concerning an uncharged offense do not infringe upon the defendant's constitutional rights because a defendant's right to counsel does not attach until after judicial proceedings have begun.  Kirby v. Illinois, 406 U.S. 682 (1972); United States v. Gouveia, 467 U.S. 180, 187 (1984).  In McNeill v. Wisconsin, the Supreme Court held that the government was permitted to question a defendant regarding other suspected crimes even though he was in custody and represented by counsel.  501 U.S. 171 (1991).  Thus, there is no question that the government is permitted to continue to investigate a defendant for other crimes they have committed, even if they know they are under investigation for those offenses.  See United States v. Hayes, 231 F.3d 663 (9th Cir. 2000) (upholding admission of tape recording of a defendant represented by counsel who had received a target letter).

Moreover, it is well established that the government may use deception to catch suspected criminals, even those who have already hired lawyers.  It would be antithetical to the administration of justice to allow a wrongdoer to immunize himself against such undercover operations simply by letting it be known that he has retained counsel.  United States v. Carona, 630 F.3d. 917, 922 (9th Cir. 2011), citing the reasoning of United States v. Martino, 825 F.3d 754 (3d Cir. 1987), where the court found no misconduct in a prosecutor giving a fake subpoena to an informant to convince a suspect that the informant had been subpoenaed to give testimony.  Under the circumstances, the government's insertion of an undercover agent to record Fattah's

voluntary statements about additional criminal activity is appropriate, and clearly not misconduct.

       D     <u>Search warrants</u>

       Fattah argues that Agent Haag lied on the affidavit for the search warrants executed at his home and office, and omitted material facts from the affidavit.  The Affidavit was thorough, comprehensive, and clearly established probable cause to believe that Fattah committed the false statement and tax fraud offenses alleged.  In the affidavit, Agent Haag identified the false statements Fattah made to obtains the loans, and the improper expenditure of the business funds for personal matters.  The information Haag received from Amato concerning the loans and identified in the affidavit was corroborated by Haag's independent examination of the banking records and review of the tape-recorded statements Fattah made to Amato, as outlined in the affidavit.

       Fattah' s argument here is little more than a rehash of his challenge to information provided by Amato.  Among these are: where the BMW purchased with loans funds was delivered, registered and insured; to whom the proceeds of the sale of the car went; how many miles it had on it when sold; and other statements Amato made to the bankruptcy court which Fattah challenges.  None have any bearing whatsoever on the probable cause established in the warrant, or the propriety of the government presenting the evidence to the grand jury.

       Fattah's argument that Agent Haag made false statements and knowingly omitted material information, in violation of <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) is misleading. Fattah has merely taken his objection to Agent Haag's description of his criminal activity (i.e. "Fattah executed his criminal schemes," and "Fattah's American Express Account was used almost exclusively for personal expenses," and argued that Agent Haag lied.  His claim that

Agent Haag made material omissions from the affidavit are equally unpersuasive.  For example, he argues that Agent Haag did not identify some of Fattah's financial transactions or discuss some of his settlement activities with one of the banks which granted a loan, neither of which is relevant to this motion.  He also claims that he told Agent Haag that 259 Strategies LLC was operating in 2010 but that his sole proprietorship was not operating using the name 259, but that Agent Haag omitted that fact from his affidavit.   First, the conversation never occurred.  Second, the information is merely Fattah's defense.  He intends to argue that he did not lie when he told the banks and the SBA that 259 was defunct and that he was earning $2,500 per month.  Apparently, his trial version will be version is that he meant that his 259 Strategies sole proprietorship was defunct, not his 259 Strategies LLC.  Other evidence introduced to the grand jury showed that Fattah as President of 259 Strategies, LLC, was earning hundreds of thousands of dollars per year.[11]  Regardless, the matter is an issue of fact.

      E.      <u>Misrepresentations to the Court</u>

      On August 11, 2014, this Court accepted Matthew Amato's guilty plea to one count of making false statements to banks, in violation of 18 U.S.C. §1014, involving Amato's 2005 line of credit applications with PNC Bank, Wachovia Bank, and Sun National Bank.  The

---

[11] For example, Fattah argues that the government did not include allegations of wrongdoing concerning the Philadelphia School District, yet such items were seized.  At the time the warrants were issued, the government had no information concerning the fraud involving the school district school.  The government seized records concerning Fattah's employment for purposes of establishing his income, pursuant to the terms of the warrant.  Fattah has not filed a motion to suppress the search warrant, so we do not discuss his misplaced claims that the warrant was overbroad, failed to particularize items to be seized, sought records which he argues go beyond the scope of the government's investigation, and other claims. Pgs. 98-108.  Moreover, Fattah has not argued, and cannot argue in good faith, that the government failed to establish probable cause to justify the searches, much less that the warrant would not have issued despite his claimed irregularities.  <u>See</u>, <u>United States v. Christine</u>,  687 F.2d 749, 754-59 (3d Cir. 1982)(despite warrant's overbroad terms, lower court can admit evidence seized pursuant to sufficiently particular portions of warrant).   The government will make the Search Warrants and accompanying Affidavit available to the Court if requested.   They are currently sealed.

thrust of the false statements, charged by way of criminal Information, were (1) that Amato was not the Chief Executive Officer of Chaka Fattah & Associates, (2) that that entity had not earned $139,000 or $140,000 in 2004, as Amato had claimed it had on two of the three bank loans, and (3) that he lied when he told the banks that the funds would be used for business purposes, when he knew that the funds would actually be used for personal expenses.

This Court's acceptance of Amato's guilty plea is a separate legal event from the indictment which Fattah attacks, and nothing which was written or said during the colloquy provides any justification or authority to quash any portion of the Indictment against Fattah. Fattah's argument in this respect, pgs. 34 – 39, is again nothing more than misleading supposition and an attempt to contest the anticipated trial evidence in a pretrial pleading by placing his version of the facts in a written motion.[12]

F.    Email Search Warrant

Fattah next complains about the execution of a valid search warrant on his personal email account maintained by Google.  The manner in which the search warrant was executed is not a basis for dismissal of the Indictment, and Fattah has not provided any authority in support of his argument.[13]

---

[12] For example, Fattah claims that in August 2003 he filed for an employer identification number for his business, which he writes "had a legal name of Chaka Fattah, Jr., and a trade name of Fattagraphy."  He had identified no such documentation for Chaka Fattah, Jr. & Associates, but included a copy of an IRS website which notes that a sole proprietor needs only one employer identification number.  Nevertheless, Fattah thus claims that the government's guilty plea memorandum concerning Amato was misleading when it said that our investigation had found no employer identification number for Chaka Fattah, Jr. & Associates.  The government's statement was correct, since there is no such number for that entity.

[13] The government employed a filter process to ensure that privileged communications were not provided to the investigative team.  Such procedures are routine.  *See* United States v. Hoffecker, 530 F.3d 137, 153 (3d Cir. 2008) (filter team properly employed by government to reviewed recorded conversations for attorney-client content); United States v. Brown, CRIM.A. 12-0367, 2013 WL 5508676 (E.D. Pa. Oct. 4, 2013) (defendant's motion for evidentiary hearing to review

government's privilege review process denied) . Were it otherwise, criminal subjects could
routinely block the execution of valid warrants for their homes, offices, and electronic devices on
the mere possibility that privileged communications could be found.

E.    Federal Rule of Evidence 6(e)

Fattah also claims that the government somehow violated the grand jury secrecy provisions of Fed. R. Crim. P. 6(e).  As a result, Fattah claims that the government's investigation caused him to lose substantial income over the past 2 and one-half years, which has somehow prevented him from hiring the counsel of his choice.  Fattah's civil lawsuit concerning this issue and his recent decision to proceed *pro se* do not provide a basis to quash the indictment.[14]  Even if Fattah's allegations were true – *and he has not come close to demonstrating that they are* – improper disclosure of "matters occurring before the grand jury" is ordinarily punishable as a contempt of court.  *See* Fed. R. Crim. P. 6(e)(2); Finn v. Schiller, 72 F. 3d 1182 (4th Cir. 1995)    As the Supreme Court held in Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988), prosecutorial misconduct will merit dismissal of an indictment only when it substantially influenced the grand jury's *decision to indict* or raises grave doubt that the decision to indict was *substantially influenced*.  Fattah has not even made such an allegation, let alone demonstrated that the grand jury was "substantially influenced" by the alleged misconduct. *See* United States v. Kilpatrick, 821 F.2d 1456 ,1465 (10th Cir. 1987) ("dismissals of indictments for prosecutorial misconduct are rarely upheld").

---

[14] By Memorandum Opinion dated August 27, 2014 at Civ. Action 14-1092, Judge Savage dismissed the Department of Justice and the Federal Bureau of Investigation from Fattah's lawsuit.  The Internal Revenue Service remains a defendant.  The government has filed a motion *in limine* to prevent Fattah from introducing irrelevant evidence of the civil litigation at his criminal trial.

For all of the reasons discussed above, the government respectfully requests that Fattah's motion be denied.

Respectfully submitted,

ZANE MEMEGER
United States Attorney for the
Eastern District of Pennsylvania

s/Paul L. Gray
Paul L. Gray
Assistant United States Attorney
United States Attorney's Office
Eastern District of Pennsylvania

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the within Government's RESPONSE TO

DEFENDANT FATTAH'S MOTION TO QUASH THE INDICTMENT WITH PREJUDICE

BEFORE THE GRAND JURY AND DUE TO REPEATED AND INTENTIONAL

GOVERNMENT MISCONDUCT

Chaka Fattah, Jr.
5783 Nassua Road
Philadelphia, PA 19131
cfattahjr@gmail.com

Date: December 24, 2014