**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA       :

           v.                   :       **CRIMINAL NO. 14 - 409**

CHAKA FATTAH, JR.           :

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its undersigned attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, Paul L. Gray, Assistant United States Attorney, and Eric L. Gibson, Trial Attorney and Special Assistant United States Attorney, files this Brief to provide the Court with pertinent background information concerning the allegations in the indictment and to address the following evidentiary issues[1] that may arise at trial:

      (1) the admissibility of summary testimony and the use of summary charts;

      (2) the admissibility of self-serving hearsay proffered by the defendant.

## I.     Introduction

As the Court is aware, Fattah has been indicted for a series of false statements to banks made to secure loans or lines of credit, bank fraud, false statements to federal agencies, tax offenses, and federal program theft, and multiple counts of wire fraud. Specifically, Fattah was charged with nine (9) counts of violating 18 U.S.C. § 1014 (false statement on loan or credit applications), one (1) count of violating 18 U.S.C. § 1344 (bank fraud), three (3) counts of

---

[1] In a separate pleading, the government will address the admissibility, pursuant to Federal Rules of Evidence 104(a), 803(6), 902(11), and Rule 902(12), of certain bank records and other business records regarding regularly conducted activity.

violating 18 U.S.C. § 1001 (false Statements to Federal Agencies and/or a federal agent), four (4) counts of violating 26 § 7206(1) (filing false income tax returns), one (1) count of violating 26 § 7203 (failure to file and income tax return),  and one (1) count of violating 18 U.S.C. § 666 (federal program theft) and four (4) counts of violating 18 U.S.C. § 1343 (wire fraud).

As will be shown at trial, Fattah has been the sole owner and "operator" of a number of business entities in Pennsylvania, according to state filings, information gathered from publicly accessible websites created and maintained by Fattah, as well as various bank records, and several consensually recorded conversations of Fattah with a cooperator as discussed below.  In 2002, while he was attending Drexel University,[2] Fattah created Fattagraphy, a photography service which earned small sums.  Fattah also claimed to have started a company called "Chaka Fattah, Jr. and Associates" ("CFJA"), a management consulting company.  The FBI has found no articles of incorporation or other supporting documentation for CFJA other than use of the name by Fattah and an accomplice to fraudulently establish business lines of credit.  In May 2005, Fattah created and registered with the State of Pennsylvania "259 Strategies, LLC," which he

---

[2] Fattah never graduated from Drexel University or completed a degree. Gregory Naylor, a political consultant, has signed a plea agreement in which he admitted to conspiring with a public official to pay down portions of Fattah's outstanding college debt using campaign funds.  Naylor deposited the campaign-sourced funds to the account of his consulting firm, then drew checks on his firm's account which he placed in the U.S. mail addressed to either Drexel University or Sallie Mae to pay down Fattah's college debt.  Naylor made these improper payments in August 2007, and continued making them through April of 2011.  The payments totaled approximately $22,660.  As discussed below, Naylor created false IRS forms 1099 for 2007, 2008, and 2010 which falsely claimed that the payments made on Fattah's behalf for his college debt were earned income to Fattah for services rendered by Fattah as an independent contractor to Naylor's consulting firm.  When confronted about the payments by federal agents in investigative interviews, Naylor on two occasions lied and repeated the cover story that Fattah was an independent contractor working for his political consulting firm.  Naylor will testify that he discussed the 1099s with Fattah, and that he told Fattah there would be tax consequences as a result of the filings.

described as a management and marketing company created to capture a wide array of concierge services associated with social and professional events, such as acquiring sports tickets, dinner reservations, etc. As discussed below, Fattah ultimately used "259 Strategies" as the vehicle to receive payments related to the wire fraud and theft of federal funds.

In 2005, Fattah also created "American Royalty," an entity which he used (1) to steal funds from prospective clients for supposedly acquiring high-end credit cards like the American Express "black card," and (2) to receive payments for marketing a board game for a real estate developer friend. During the time period of his various frauds, Fattah also utilized the entities "Wall Street Development" and "Boy Genius Web Design" to submit small invoices for "marketing" or "web-design" services on income which he did not report to the IRS. In the beginning of his criminal activity, Fattah used the address of his Henry Avenue apartment in Philadelphia as his "business" address.

In summary, the evidence will disclose at trial that over a period of years, Fattah's main business entity, "259 Strategies," was essentially a shell into which Fattah deposited the proceeds of seven separate business lines of credit and/or loans from Philadelphia banks. Although the banks' terms specified that the credit extended to Fattah and/or his accomplice was for corporate and business purposes, he primarily spent the loan proceeds instead on extravagant personal living expenses and high-priced vehicles and, in 2011, on gambling debts at local casinos. Some of the credit obtained by Fattah was partially guaranteed by the Small Business Administration ("SBA"). Fattah later made material misrepresentations that caused the SBA to pay off portions of his delinquent debts to the banks. Fattah also failed to timely file federal income tax returns for several years, and when he did file the returns, they were false.

3

Finally, Fattah committed a fraud upon the Philadelphia School District ("PSD") with his former employer, the owner of Delaware Valley High School ("DVHS"). The evidence will show that Fattah was intrinsically involved in all aspects of DVHS business. DVHS contracted with PSD to provide educational services to students in Philadelphia. Fattah, posing as DVHS's affiliated minority business enterprise, worked for DVHS under the names "259 Strategies" and "Legal Marketing Strategies." Fattah started in 2009 at $75,000 per year and in October 2010, signed a final contract which provided Fattah's "259 Strategies" with compensation in the amount of $450,000. Fattah and his employer submitted false budgets to the PSD which listed non-existent employees and inflated the costs of teacher salaries and benefits. Fattah and his employer pocketed the difference and spent the money on personal expenses. As will be introduced at trial and is described in detail below, Fattah made a number of starkly incriminating admissions about the budgets to PSD employees and an undercover FBI agent.

The proof at trial will consist of Fattah's admissions, some of which are captured in consensually monitored recordings. Evidence will also come from the testimony of Fattah's former friends, associates, and co-coworkers. Proof will also come from contracts, loan applications, tax filings, Fattah's accountants' notes, his attorneys' files and other documentary evidence from various banks and other financial institutions, PSD, DVHS, and other business entities. Additionally, Fattah's own "business" records, such as they are, and files obtained from a search of his personal computer an DVHS computer will also support the charges. The factual background is described below in roughly chronological order.

## II.   Factual Background

### A.   False Statements to Fraudulently Obtain Lines of Credit (Counts 1–7)

4

In 2005, Fattah began scheming to fraudulently obtain four lines of credit from various local banks. During the course of his fraud scheme, Fattah enlisted Matthew Amato, a friend from Drexel and his then roommate, to participate in taking out three additional lines of credit in 2005.[3] Fattah, and to a lesser extent, Amato used the lines of credit for personal and living expenses. These seven 2005 loans total $141,000, as follows:

| Fattah | | Amato | |
|---|---|---|---|
| Citizens Bank | $26,000 | PNC Bank | $15,000 |
| PNC Bank | $15,000 | Sun Nat. Bank. | $25,000 |
| Sun Nat. Bank | $25,000 | Wachovia | $25,000 |
| Bank of America | $10,000 | | $65,000 |
| | $76,000 | | |

The evidence at trial will demonstrate that when Fattah initially applied for a business line of credit at Citizens Bank in 2005, he learned that to qualify for such a loan he needed to supply the bank with some proof of income, such as an income tax return showing business revenue from an existing entity. Fattah had no steady income at the time and no existing revenue-generating business which would have satisfied the bank. To overcome this deficiency, Fattah enlisted an unwitting accountant at his sister's then-law firm to create his income tax return for 2004 out of whole cloth. Fattah supplied the accountant with fictitious revenue and expense figures which Fattah claimed he incurred during _2004_ while doing business as "259 Strategies" by providing photographic and management consulting services.[4] After obtaining the false return from the unwitting accountant, Fattah filed the document with the IRS, which falsely

---

[3] Amato has signed a cooperation agreement and pleaded guilty to an information charging one count of providing false statements to obtain a bank loans, in violation of 18 U.S.C. § 1014. At the government's direction, Amato engaged in a series of recorded conversations with Fattah during the investigation of this matter. References to his anticipated testimony are discussed in summary below.

[4] As noted above, Fattah did not actually create "259 Strategies" until 2005.

claimed $140,000 in revenue and took approximately $132,000 in deductions for 2004. As completed, the false return created a tax liability of $1,145 which Fattah paid with a credit card.[5]

Thereafter, Fattah and Amato used the bogus revenue figures on the 2004 false return to fraudulently obtain the seven business lines of credit between June and November 2005. Instead of using the funds for business expenses, as they agreed to do with the banks, they transferred the funds to Fattah-controlled accounts, from which Fattah withdrew cash or paid down his and his associates' significant personal credit card expenditures.

While Fattah was obtaining business loans in the name of "259 Strategies," Amato took out three lines of credit by falsely claiming that he was the owner or Chief Executive Officer of Chaka Fattah, Jr. & Associates ("CFJAS"), allegedly another management consulting business. At Fattah's direction, Amato falsely claimed that CFJA had 2004 revenue in precisely the same amount, $140,000, that Fattah had claimed for "259 Strategies." Other than a few invoices and a credit card in the name of CFJA, investigators have found no business records or earnings for CFJA. Fattah is charged in Counts One through Four with making false statements to the banks where he personally applied for lines of credit, and in Counts Five through Seven with aiding and abetting Amato in making false statements to the banks at which Amato applied for lines of credit. Among the items purchased by Fattah and Amato with their criminal proceeds was a BMW automobile. During the scheme, Fattah attempted to enlist yet another college friend who was also acquainted with Amato. The government intends to call this additional associate of

---

[5] The evidence will demonstrate that after utilizing the false 2004 tax return to obtain a line of credit, Fattah paid the credit card bill, which included his tax payment, with the fraudulently obtained loan proceeds. Eventually, Fattah defaulted on the credit, too. In a recorded conversation with Amato which will be played at trial, Fattah admitted that the schemers "took a hit" (paid the tax) on the 2004 return in order to get the lines of credit in the first place.

Fattah's who will testify that Fattah described the scheme to him and unsuccessfully solicited him to make false loan applications during the same time period and to share any loan proceeds with Fattah.

Thus, the first four counts in the indictment concern Fattah's personal false representations to procure the four business lines of credit from June through November 2005.  Fattah ultimately defaulted on the loans, three of which were guaranteed by the Small Business Administration (SBA). The SBA does not make direct loans to small businesses, but instead sets guidelines on loans extended by its partnered private lending institutions. The SBA guarantees that if the borrower defaults, it will pay one half of the loan balance, thus eliminating some of the risk to its lending partners and encouraging loans to small businesses that would otherwise not qualify.  When an applicant applies for a SBA-backed loan, it is actually applying for a commercial loan with the SBA guaranty.  As discussed in greater detail below, in March and October 2010, after he defaulted on his loans, Fattah gave false statements to the SBA and to the FDIC-insured institutions and loan holders about his financial status.  As a result of those lies, Fattah signed satisfaction agreements settling two of the three SBA-insured loans for less than the full balance due.  He later lied to the SBA agent investigating the matter.

Attached to this memorandum are summary charts created by an FBI Forensic accountant to describe Fattah's expenditure of the fraudulently obtained loan funds.  Included is a chart[6] concerning the flow of funds from Fattah's $26,000 line of credit from Citizens Bank, which is charged as Count One.   The chart demonstrates that Fattah wrote $15,000 checks to cash and made nine separate ATM withdrawals totaling $5,000 from the loan proceeds, then deposited the funds to

---

[6] *See* Attachment A.

his Commerce Bank account, which served as a type of clearing house for Fattah. Fattah then transferred $15,599 to his personal American Express credit card and $3,000 to his personal MBNA credit card account. The American Express transaction paid for personal charges by Fattah and friends who were issued cards linked to Fattah's account. Fattah had an outstanding balance on the MBNA credit card because he had previously obtained a $9,975 cash advance from the MBNA account which he moved into his "259 Strategies" Commerce account. He also transferred loan proceeds to his personal line of credit at Household Finance.

The evidence will demonstrate that Fattah lied to the banks when he claimed that he would use the funds for business purposes. Instead, Fattah used the funds primarily for personal expenditures. The second chart[7] included with this memorandum shows Fattah's expenditures from his personal American Express credit card, which received nearly $16,000 obtained from the business line of credit at Citizens Bank. Fattah, and his friends with cards issued on Fattah's personal American Express account, used the loan proceeds for a myriad of personal expenses, including clothing, education expenses, jewelry, BMW costs, liquor purchases, gas station and convenience store expenses, Walmart purchases, and restaurant and bar purchases. Additional charts will be presented at trial regarding Counts Two through Four displaying expenditures for each of the other lines of credit Fattah obtained in 2005 through false representations made to PNC Bank, Sun National Bank, and Bank of America. These summary charts and the accompanying testimony will show that Fattah improperly used tens of thousands of dollars in business loan funds to pay off not only his American Express credit card bills, but also his Bank of America and MBNA personal credit card debts.

---

[7] *See* Attachment B.

In a consensually recorded conversation on May 20, 2011, Fattah told Amato, "SBA loans was for working capital. Working capital can be used for anything, working capital can be used to pay my salary, your salary, a party at R2L [a bar/lounge}, anything."  Later in the same conversation, Fattah, referring to "259 Strategies" during the 2005 and 2006 time period, stated, "We took some shots, I definitely had some personal expenses and so did you, we were living our own lives. At the end of the day it is what it is."

As noted above, Amato fraudulently received a total of $65,000 from business lines of credit in 2005 at PNC Bank, Wachovia Bank, and Sun National Bank, as charged in Counts Five through Seven.   Using the fraudulently obtained funds, Amato wrote checks to Fattah at Fattah's direction for $62,500, all of which Fattah deposited to his Commerce Bank "259 Strategies" account.  From there, Fattah transferred some of the funds to his American Express credit card and purchased the aforementioned BMW for $45,000, which he and Amato drove primarily for personal use but later claimed was intended to impress local business executives whom they pitched high-end concierge services for yet another of Fattah's "business" entities, "American Royalty."  The rest of funds from the business lines of credit obtained by Amato were transferred by Fattah to his Bank of America and MBNA credit card accounts to pay down Fattah's considerable personal debts.

## B.   Tax Offenses (Counts 14-18)[8]

Between 2005 through early 2009, Fattah had income from a variety of different pursuits, almost all of which he failed to disclose on his income tax returns.  The evidence will show that

---

[8] Fattah is charged with filing false returns for 2005, 2006, 2008, and 2009.  He is not charged with filing a false return for 2007.  For reasons discussed below, Fattah declined to file his 2007 return with the others, all of which were filed late in December of 2010.  His decision not to file his 2007 return with the others is evidence of his then-state of mind and further illustrates his willfulness regarding the charged tax offenses.  In short, he was unhappy with the tax due and owing on his 2007 return at the time it was prepared.

he "earned," or at least obtained, approximately $85,000 in income during 2005 providing "consulting services" to Mikel Jones, a plaintiff's attorney,[9] under the name "259 Strategies." He earned small sums under the name Fattahgraphy while taking photographs for political groups.

During 2007 and 2008 Fattah stole approximately $50,000 from individuals who had been deceived by Fattah's advertisements for American Royalty, which Fattah claimed was a high end luxury concierge service. For a substantial fee, Fattah falsely claimed that he could provide individuals and corporations with special access to restaurants, sports events, luxury air travel, and other high-end services. Specifically, Fattah promised many of his victims that he would assist them in obtaining an American Express "black card," which had significant benefits for high-spenders. Fattah never obtained the cards and never refunded the money he stole from the people who responded to his advertisements. In fact, the government has seen no evidence that Fattah even attempted to obtain the black cards. Additionally, in 2006, Fattah also obtained $3,000 from a prospective customer of American Royalty by falsely claiming that Fattah could get his victim a round of golf for a $6,000 fee at the Pine Valley golf course, an exclusive private course in New Jersey. After he paid Fattah a fifty percent deposit, the victim never heard from Fattah again. In deceiving this victim, Fattah presented him with a brochure containing outrageously false claims and a fee schedule which outlined all of the "services" which American Royalty would "provide" for an annual $24,000 fee.

Some of the web-site information existing at the time associated with American Royalty and Fattagraphy described Fattah as an "Entrepreneur, Socialite, Lifestyle Mogul." The evidence will show that Fattah's concierge service was essentially a scam, and that Fattah had no

---

[9] Jones was convicted in this district in late 2011 of defrauding the hedge fund which financed his Philadelphia plaintiff's law firm.

high-end concierge clients.[10]  Fattah's former American Royalty "media contact" is expected to testify that, other than Mikel Jones, she never met anyone who actually obtained concierge services from Fattah.  She disassociated herself from Fattah after she received calls and emails from some of the victims who had paid Fattah to obtain "black cards."  One of those victims was an eighteen year old who pleaded unsuccessfully with Fattah by email to return his $10,000 payment.

During portions of 2008 and 2009 Fattah was employed by a local real estate developer who paid Fattah and another person to market a Monopoly-like real estate board game as an educational tool.  During a recorded conversation with Amato in May 2011, Fattah admitted that he was paid four or five thousand dollars a month by the developer "off the books."  In a later recorded conversation in July 2011, Fattah said that when he discussed his compensation with the developer that "I wasn't thinking about taxes."  When Amato asked him why, Fattah said he was making about $4,000 a month and just converted the checks from the developer to cash.  When Amato said "but if you ever reported that you'd be f…d," Fattah replied that the developer "would be f…d because he's the employer, he's responsible for paying the taxes," but in the same conversation Fattah recognized that "I'll get f…d too."

Fattah's signed his first contract with DVHS, the alternative education provider, in May 2009, at $75,000 per year to be a grants and development officer.  Shortly thereafter he obtained an accountant to prepare his federal income tax returns for years 2005 through 2008.  After obtaining the DVHS contract, Fattah, attempting to achieve some level of legitimacy, told the accountant that he needed to be "compliant" with his reporting requirements.  The accountant

---

[10]  Fattah did purchase some basketball tickets for Mikel Jones, but ultimately he defaulted on the credit card to which he had charged the tickets without paying the bill for them.

11

requested and received a power of attorney from Fattah so she could contact the Internal Revenue Service to receive whatever documents were available concerning Fattah's earnings. Fattah had previously told the accountant that he had no business records, bank statements, or expense records for his business activities.   As was her practice, the accountant requested Fattah to identify all of his income for each tax year.

Thereafter, the accountant prepared Fattah's returns for 2005 through 2008, based upon what she learned from the IRS and the information provided to her by Fattah.  Those returns prepared by the accountant reported the following adjusted gross income:

| Tax Year | Adjusted Gross Income Reported |
|----------|-------------------------------|
| 2005 | $196.00 |
| 2006 | $1,000 |
| 2007 | $36,244 (debt forgiveness) |
| 2008 | $3,717 |

12

The government will demonstrate at trial that Fattah should have reported the following
approximate income amounts:

| Tax Year | Unreported Income to Fattah (approximate) |
|----------|-------------------------------------------|
| 2005 | $82,412 in "consulting fees" from Mikel Jones |
| | $1,900 for photography services for the Congressional Black Caucus |
| 2006 | $6,000 to American Royalty from Mikel Jones |
| | $12,500 for photography services for the Pa. State Senate Democratic Caucus |
| | $3,000 defrauded from American Royalty "client" |
| 2007 | $40,000 defrauded from American Royalty "clients" |
| 2008 | $29,280 from real estate developer (credit card) |
| | $7,500 in checks from real estate developer |
| | $1,500 from Garnett Littlepage to Boy Genius Web Design |
| | $10,000 defrauded from American Royalty "client" |

Fattah prepared his own income tax return for 2009. He reported the income he earned at
DVHS, which was documented with IRS on a form W-2. Fattah did not report approximately
$5,986 he received "under the table" from the real estate developer.

As referenced above, the accountant also prepared a 2007 income tax return which Fattah
refused to file. On this return, the accountant had attributed $36,244 in income to Fattah as a
result of debt forgiveness by credit card companies who had written off or otherwise settled
Fattah's then-existing large unpaid credit card bills. The accountant had received information

13

regarding the debt forgiveness from the IRS, which had received notification of the write-offs from the credit card companies directly. Fattah told the accountant he objected to the inclusion of the income, and he did not file the 2007 return when he filed the 2005, 2006, and 2008 returns prepared by the same accountant. Indeed, Fattah only filed a 2007 income tax return in July 2012, approximately five months after federal agents executed search warrants at his office and home and he became aware that he was under investigation for tax and other offenses.

In his 2007 return filed after he learned of the federal investigation, Fattah reported $45,000 in gross receipts or sales, including $40,000 in receipts for American Royalty. The $40,000 reported by Fattah in 2012 is the precise amount the government will demonstrate Fattah defrauded from six victims of American Royalty in 2007. The other $5,000 Fattah reported after learning he was under investigation is attributable to the $5,000 he received in 2007 from the aforementioned consulting firm owned by Gregory Naylor. The accountant who prepared Fattah's earlier income tax returns based on information she received from the IRS included the income reflected on the 2007 and 2008 bogus 1099s prepared by Naylor. The evidence will show that on Fattah's 2009 return, which Fattah prepared himself, he did not report $5,250 in income from payments made by Naylor because Naylor had neglected to file a 1099 for Fattah that year. In other words, since Naylor did not prepare an IRS form 1099 for 2009, the IRS was not aware of the payments, and Fattah was able to hide it, which he did.

During the execution of search warrants on his residence and office, Fattah told federal investigators that Mikel Jones was a paying client, and admitted that he had received the funds identified above from Jones during 2005 and 2006. Fattah also admitted that he had worked in marketing for the real estate developer for about nine months during 2008, during which time he

14

estimated he earned a total of about $36,000.  When shown his 2005 and 2008 income tax

returns, which did not contain those sums as income, Fattah falsely claimed that his accountant

must have made a mistake.   He further claimed to agents that he was dissatisfied with the

accountant's work at the time.  Nevertheless, Fattah signed the returns prepared by the

accountant, which show adjusted gross incomes of $0 for 2005, when he admitted he received

almost $85,000 from Jones, and $3,717 during 2008, when he admitted working for the real

estate developer for months and estimated that he had received $36,000.[11]  When IRS agents

inquired whether it was possible that Fattah had told his accountant about the income from the

real estate developer and the accountant had unilaterally chosen not to report it, Fattah stated that

was not possible.

As discussed above, by 2010 Fattah was employed by Delaware Valley High School,

where he signed the series of contracts which increased his compensation from $75,000 a year to

a high of $450,000 by the end of 2010.[12]  From that figure Fattah paid some expenses and also

the salaries of other DVHS employees.  Fattah enlisted a new accounting firm to prepare his

2010 federal and state returns.  Fattah shared with his new accountants that Fattah needed the

---

[11] The agents were unaware of Fattah's scheme involving the American Express black cards at
the time of the interviews, so Fattah was not questioned regarding that income.
[12] Fattah started his employment in 2009 with DVHS as a "grant writer" for $75,000 per year.  In
January 2010, Fattah signed the first of four separate contacts that year, the last of which, signed
in October 2010, increased the payments to "259 Strategies" to $450,000 annually.  Pursuant to
his relationship with DVHS, Fattah became the registered Minority Women Business Enterprise
("MWBE") contractor for DVHS.  Under Philadelphia's contracting rules, DVHS was required
to pay 10% of the total value of its contracts with the city to a minority vendor.  By late 2010,
DVHS's contracts with the city totaled approximately $4.5 million, of which "259 Strategies"
was to receive 10%, or approximately $450,000.  As part of his scheme with the owner of
DVHS, DVHS shifted some employees to Fattah's payroll at "259 Strategies" to lend legitimacy
to Fattah's entity as an MWBE contractor and to shift some of the costs borne by Fattah's
accomplice to Fattah in exchange for the MWBE contract.

2010 return to apply for still another bank loan. The accounting firm used Fattah's corporate

Quickbooks to prepare the federal return, which reported $142,458 in taxable income to Fattah

and a penalty and tax due of $51,239.[13]

The firm's employees reviewed the prepared tax return with Fattah, who clearly

understood his tax liability. Fattah filed for an extension with the IRS permitting him to file his

return after April 15th, but was informed that payment of the tax due could not be extended and

that he needed to pay his tax by April 15, 2010. Fattah did not pay the tax due by that date, nor

did he follow the accounting firm's advice to make arrangements with the IRS for installment

payments on the tax debt. Instead, he simply ignored his tax obligation.

C.    False Statements to the SBA and an SBA Agent (Counts 8-11)

Fattah is charged in Counts Eight and Nine with two counts of making false statements to

PNC Bank and Citizens Bank to settle his SBA-insured debts with those banks. In March 2010

(PNC Bank) and in October 2010 (Citizens Bank), Fattah completed SBA Forms 1150, Offer in

Compromise, and 770, Financial Statement of Debtor, for the banks. In the documents he

offered to settle the bank debts for less than he owed and claimed that he was earning $2,500

monthly. He also explained to both banks why his business entity failed and he could not repay

the loans in full. On the SBA Form 1150 supplied to Citizens Bank, on which he offered to pay

$10,000 of the outstanding $31,434 then due, Fattah wrote the following, in part:

> "I had a business focused on consulting, specifically marketing and public relations
> services called 259 Strategies. 259 Strategies ceased operations in 2007. I believe the

---

[13] The return preparer disallowed some educational expenses that Fattah had proposed based
upon some payments Fattah had made on his Drexel college debt. Fattah did not inform this tax
preparer, or the accountant who prepared his earlier tax returns, that some of his school debts
had actually been paid by Gregory Naylor.

amount offered bears a reasonable relationship to the best net amount recoverable through enforced collection. I will borrow the above amount from a family friend to settle this matter. 259 Strategies ceased operations due to lack of revenue."

In March 2010, Fattah was earning $6,250 per month pursuant to his contracts with DVHS. In October 2010, Fattah's "259 Strategies" was "earning" $450,000 yearly, or $37,500 monthly, from DVHS. Fattah's 2010 personal income tax return claimed a taxable income of $142,458.

Fattah is charged in Count Ten with making false statements for repeating his false income claims to an investigating Small Business Administration agent. In a 2011 tape-recorded conversation with Michael Moffa, who identified himself as an investigator with the Small Business Administration Office of Inspector General, Fattah said that the information he provided on the SBA Forms for PNC and Citizens banks on March 5, 2010, and October 11, 2010, concerning his income was accurate at the time he provided it.[14]

Fattah is charged in Count Eleven with making false statements to Sun National Bank during a deposition held in May 2008, after he was sued by the bank for non-payment on his line of credit. In the lengthy deposition, Fattah lied under oath when he said that he had no savings or checking accounts, and that his American Royalty concierge business had had no clients since 2007. In fact, Fattah had corresponded with one of his American Royalty victims on his cfattah@americanroyalty.com account months earlier in November and December 2007. Additionally, only one month before the deposition, Fattah received a $10,000 wire transfer from

_____

[14] Fattah's disingenuous settlement offer was rejected by PNC, and the loan was eventually satisfied by the SBA for $9,426, half of the value of the debt owed. The gross loss was $7,249. Citizen's Bank, however, accepted Fattah's misrepresentations and offer of $10,000, which the SBA, in fact, paid. The loss on the loan is $15,962. Fattah's debt was written off at $9,100.

another victim in payment for Fattah's "services" regarding an American Express black card

Fattah claimed he would obtain for the victim. We have seen no evidence that the victim got the

card or a refund.[15]

### D. Bank Fraud and More False Statements to Financial Institutions (Counts 12-13)

Even after he was employed at DVHS and earning well in excess of $100,000 per year,

Fattah's significant spending caused a financial strain. Fattah also took out lines of credit with

two additional banks in late 2011 and early 2012, after his employment with DVHS became

tenuous and he needed money to cover his gambling debts. Fattah took out lines of credit with

United Bank of Philadelphia and the Philadelphia Federal Credit Union for $50,000 and $15,000,

respectively.

In March of 2011, Fattah applied for a commercial loan for "259 Strategies" with United

Bank. He explained that the purpose of the loan was to afford "259 Strategies" a working capital

line of credit from which the business could meet expenses, including payments to the DVHS

employees on Fattah's payroll while Fattah was awaiting his payment from DVHS.

Approximately one month later, United Bank approved a $50,000 line of credit (less than the

amount Fattah had requested). During the application process, Fattah concealed his outstanding

$50,000 tax debt to the IRS on a financial statement submitted with his credit application.

---

[15] Fattah also testified during the deposition that he was unemployed. The deposing attorney
then questioned Fattah at length about information he copied from website
www.chakafattahjr.com the night before the deposition. The website claimed that Fattah was the
Chief Marketing Officer of the real estate developer's Real Estate Mogul Corporation. The site
also claimed that Fattah "ventured into high net worth marketing and luxury services" in 2005
with American Royalty. The site claimed that American Royalty "no longer discloses the
number of clients, however, it is experiencing significant revenue and profit growth" (emphasis
added). The site also noted that Fattah founded Boy Genius, a full service marketing and
interactive firm, which "has worked with over 10 clients during the first four months of 2008."

In reliance upon Fattah's misrepresentations, the bank approved the transfer of the entire $50,000, to Fattah in April 2011.  As the summary charts[16] accompanying this memorandum show, within three days of receiving the first advance on April 25, 2011, Fattah transferred almost $16,000 in United Bank's loan proceeds to pay down his personal credit card bills, his girlfriend's car payment, and used $17,500 of the funds to pay his debt to Sugarhouse casino. The enclosed second chart shows that Fattah took a second advance of $24,500 on the bank's line of credit on May 31, 2011, after the line had been paid down.  Within a week of this advance, Fattah transferred approximately $2,750 of the United Bank funds to pay personal credit cards and also paid $16,000 to Harrah's, another casino.

Unsurprisingly, Fattah went into default on the United Bank loan within months. Eventually, United Bank rewrote the loan in the name of Fattah's newest entity, "Legal Marketing Strategies," after Fattah provided the bank with a copy of the September 2011 contract he signed to provide "marketing services" to the law firm run by the owner of DVHS for $12,000 per month.[17]  Fattah agreed to pay off the $50,000 plus debt over an eighteen month period. He never made a single payment.   For the re-written loan, Fattah submitted to the bank a second personal financial statement, dated September 2011, which contained liabilities, such as a significant tax liability, which he did not disclose on the original financial statement supplied to United Bank.

Despite owing United Bank in excess of $50,000 and his large delinquent obligation on his 2010 federal taxes, Fattah in October 2011 signed a lease with an option to buy agreement on

---

[16] *See* Attachments C and D.
[17] Fattah was fired from DVHS in July 2011, and re-hired as "Legal Marketing Strategies, LLC" in September 2011.

a $600,000 condominium at the Residences at the Ritz, overlooking City Hall.  He deposited in excess of $10,000 in advance and moved into the Ritz in December 2011.  Thereafter, Fattah owed $3,500 monthly in rent on the condominium.  Since his personal expenses and liabilities were still considerable, Fattah was in financial difficulty almost immediately.

In January 2012, Fattah applied for a $15,000 personal line of credit from the Philadelphia Federal Credit Union ("PFCU").  Count Thirteen charges that Fattah made false statements in this loan application when he failed to disclose his outstanding $50,000 debt to United Bank of Philadelphia and provided false information about his rent and other monthly personal expenses.  For example, Fattah claimed that while he was a co-signer on his girlfriend's car, an Audi, she actually made the monthly payments.  Fattah's former girlfriend will testify that Fattah paid the monthly lease and insurance payments (approximately $800 and $250, respectively) on the Audi, which is corroborated by the available banking records.  Fattah ran the line of credit to the $15,000 limit and never repaid the loan.

### E.    Theft of Federal Funds and Wire Fraud Involving PSD (Counts 19-23)

Since the early 2000's, a Philadelphia attorney owned and operated Unique Educational Experience, Inc., which does business as DVHS.  DVHS is a for-profit business which provides alternative education opportunities to students with disciplinary problems and also to other at-risk middle school and high-school students.  At various times since 2007, DVHS operated several schools in Philadelphia under contract with the PSD.  DVHS also contracted with the Bucks and Berks County School Districts.  In addition to operating DVHS, its owner was at the time a practicing attorney through his law firm bearing his name.  He focused his civil litigation

practice on personal injury, medical malpractice, consumer fraud, employment discrimination, and commercial litigation matters.

In July 2010, the school district cancelled a contract for a student program run by a competitor of DVHS. Thereafter, DVHS signed a contract to run a program for 200 students at what DVHS called the DVHS Southwest School ("Southwest") during school years 2010-2011 and 2011-2012. As part of the contract, DVHS submitted school budgets in September and October, 2010, after the first contract was awarded, and again when the contract was amended in July 2011, a year after DVHS started operating the Southwest facility. The school served a population consisting of older students and students who had previously dropped out of school. These students were placed in an "accelerated" program to push them towards graduation.

A PSD representative is expected to testify that vendors are required to submit their budget to the school district so the district can verify that the vendor has the proper administrative and teaching personnel and the infrastructure and resources in place to carry out their contract successfully. The budgets are part of the contract with the PSD.

On September 27, 2010, DVHS's owner emailed the 2010–2011 Southwest budget to the PSD. Fattah was copied on the email. On July 13, 2011, before the start of year two of the contract, Fattah emailed a copy of the 2011-2012 budget to the PSD. Fattah copied DVHS's owner on the email.

The budgets Fattah and DVHS submitted to the PSD for the Southwest school are demonstrably false according to knowledgeable DVHS employees who will testify at trial, DVHS's own payroll records, the teacher contracts, and other evidence. Moreover, that evidence will show that Fattah was aware of the false budget figures supplied to the school district, and

21

actually profited from them himself.  At times, Fattah served as the Chief Operating Officer for DVHS and was aware of DVHS's actual regularly maintained payroll reports, including those for the Southwest school which differ markedly from the false budgets which were supplied to the school district.  In addition, as described in detail below, Fattah admitted that the DVHS budget figures submitted to PSD were false in tape-recorded sessions with School District employees and an undercover FBI agent.  Further, evidence seized pursuant to search warrant from his own computers shows that he was aware that the school district-supplied budgets were false.

Indeed, the evidence will show that Fattah was intrinsically involved in all aspects of DVHS business.  In June 2010, Fattah as President of 259 Strategies signed a two year contract to serve as Chief Operating Officer for DVHS.  Testimony from DVHS employees will show that Fattah was involved in starting and operating at least three different DVHS schools, including the Southwest school.  He acquired equipment for the buildings, dealt with vendors, and hired teachers and staff.  DVHS employees will testify that Fattah as Chief Operating Officer maintained charts of administrators, teachers, and other employees and their salaries.  The evidence will also show that Fattah was also intimately familiar with the company's profit and loss figures.

The false Southwest budget listed teachers' salaries as $45,000 per year.  The largest false figure on the Southwest budgets given to PSD, however, was a line item labeled "Benefits" with corresponding costs of $170,000 per year.  In actuality, the Southwest teachers were paid $36,000 per year, with $5,000 deduced from their salary to pay for benefits if they elected to receive them.  The $170,000 budgeted for benefits simply went into the pockets of DVHS's owner and his right-hand man, Fattah.

22

Additional falsities included a fictitious computer lab teacher allegedly earning $45,000 per year. The false budgets included additional inflated salaries and costs such as an annual salary of $45,000 for administrative assistant who was in reality earning approximately $35,000 per year. Additional inflated salaries were listed for the school director and a behavior specialist (who was only present for part of the contract time), but that the specialist was paid $40,000 per year, not the $55,000 the budget noted. According to the DVHS budget for Southwest, there were three four Youth Service Assistants at $30,000 per year. In fact, Southwest never had more than two such assistants at any one time, that they were paid $15 per hour in the beginning and never made more than approximately $18,000 to $22,000 when they were switched over from hourly to salaried employees. The budgets listed two Psych Extern Program employees listed at a total cost of $60,000, and a post-graduate/counseling employee at $50,000 per year. In fact, the only Psych Extern Program persons at DVHS were unpaid LaSalle college graduates who worked at a different DVHS facility, not Southwest.

A DVHS employee will testify that she unsuccessfully confronted DVHS's owner over these false figures. She also confronted Fattah about the figures. Fattah tried to explain the inflated costs by attributing them to some ill-defined "labor burden" on DVHS which allegedly justified the numbers on the budget. The DVHS employee will testify that she listened to Fattah's explanation, but told Fattah, "This is still nonsense, this whole budget."

On February 29, 2012, federal agents executed search warrants at Fattah's home and office space at DVHS. Among the documents seized from Fattah s' computers was a fiscal year 2011-2012 "maintenance chart" which shows a total of $382,000 in salaries and bonus payments for nine teachers and personnel at Southwest, far less than the $850,000 costs for the salaries and

23

benefits for the 15 people on the 2011–2012 budget provided to the school district.  Notably, the document from Fattah's own computer does not contain the $170,000 figure for the yearly benefit costs for the Southwest personnel which was included on the budget supplied to PSD.

During the search agents also recovered from Fattah's computer records an "administrative staff and expense" record dated July 12, 2011, which was the day before Fattah himself emailed the 2011- 2012 Southwest budget to PSD.  The portion of the record dealing with Southwest for the 2011-2012 school year included a total labor figure of $450,000, including an unspecified "labor burden," far less than the $680,000 labor figure contained in the budget Fattah sent to PSD the next day, July 13, 2011.  Fattah's record on his computer also did not include the false $170,000 benefits figure supplied to the School District.

On March 2, 2012, Fattah appeared at the Philadelphia School District Office of Inspector General.[18]  There, he reported that the owner of DVHS was misusing school funds for personal purposes, was violating Philadelphia's MWBE requirements, and was committing contract fraud.[19]  In three tape-recorded meetings with the School District, Fattah thoroughly incriminated the owner and himself for submitting false budgets to the district.  In short, during the March 2, 2012, conversation Fattah discussed the budget figures for Southwest and explained that teachers did not receive the $45,000 in salary claimed on the budget.  Fattah admitted there

_____

[18] After the execution of the search warrants on February 29th, the School District informed the government that on February 21st they had received an anonymous email on their confidential website from an individual, whom they later understood to be Fattah, looking for a fee or reward for exposing misappropriation of school funds.  The evidence will show that Fattah's original motivation in reporting DVHS fraud to PSD was to get DVHS out of the business and out of his way because Fattah and another DVHS employee were intending to start their own alternative education services company, called Dreamchasers.  After learning Fattah intended to meet with the PSD, an undercover FBI agent was inserted into the meetings and secretly tape-recorded Fattah's admissions to the School District.

[19] Not all of the DVHS related fraud has been charged in this indictment involving Fattah.

was no counselor at Southwest, when the budget contained one.  He literally scoffed at the

$170,000 benefits figure, saying "this entire line is bullshit."  He noted that there were only two

or three people at Southwest who took benefits and said that "if" the company paid for the

benefits (and the evidence will show DVHS did not) "it would have cost the company about 10 –

15gs."  He admitted that the benefits cost $5,000 and it "comes out of their salary."  Saying he

could break it down for the school district, he noted that there were actually only ten people

working at Southwest.  The budget contains fifteen.

Fattah discussed the budget figures provided for the Southwest school line by line, and

explained, among other things, that the teachers did not earn what the budget said they earned,[20]

that there was no counselor at Southwest, even though the budget claimed there was, and that the

budget contained false figures for the number and salary of Youth Assistants at the school.

He also pointed to a portion of the budget identifying $110,000 to be paid for "contract

services."  Fattah noted that the $110,000 was really the figure for three graduate student

counselors supposedly being paid a total of $110,000.  He admitted that there were no such

counselors, as identified on the budget and explained that the $110,000 was split each year

between himself and two other persons, neither of whom worked at the Southwest school.

During one of the conversation Fattah admitted that he "I was going to be out the door

anyway. I was going to start my own thing and go after some opportunities."  Apparently, that

was true.  In early 2012, Fattah hired Growthink, a California business consultancy, to assist

---

[20] While talking with Amato in July 2011, a week after he sent in the Southwest budget with
$45,000 yearly teacher salaries, Fattah commented that he paid his teachers "36," and bragged to
Amato that he had teachers "at another location" making $23,000. He disparagingly says of the
teachers, "Here, take the money m… f…"

with the preparation of a "Strategic Direction Document" which identified Fattah as President

and another then-DVHS employee as Educational Director of a new entity called

"Dreamchasers."[21] The document described "Dreamchasers" as an education services company

which will operate as an alternative education high school specializing in transition services and

accelerated learning.   The document also claimed that "Dreamchasers" would target public

school districts in Philadelphia to secure contracts to provide "at risk" students with

individualized academic instruction and behavior modification counseling to assist students to

return successfully to the regular classroom.   The tentative engagement timeline in the booklet

calls for a final business plan on March 22, 2012.  Apparently, the execution of the search

warrants on Fattah's home and office in February 2012 altered his timetable on this venture.

**III.    Use Of Summaries and Charts**

      Pursuant to Federal Rule of Evidence 1006, the government intends to introduce during

its case in chief summaries and charts of illustrating some of the evidence gathered during the

investigation.  FBI Forensic Accountant Renee Michael has created charts which summarize

Fattah and Amato's receipt and misuse of the illegally obtained credit lines in 2005, and Fattah's

circulation of the fraudulently obtained bank funds through an array of bank and credit card

accounts to pay off personal debts. The expenditure of these funds for personal uses is contrary

to the loans agreements Fattah and Amato entered into with the banks, which required them to

use the funds for working capital and other business expenses.   Her charts will summarize

---

[21] Fattah's records note possible financing for this venture from a number of persons, one of
whom lent a Fattah family member $150,000 to pay off Fattah, Jr.'s IRS debts after this
investigation came to light, and a second person who gave free rent to Fattah and his sister and
who has paid a portion of Fattah's legal fees.

voluminous bank records, casino gambling records, and other financial records, such as the credit card statements noted above.

Ms. Michael will also summarize Fattah's spending during 2010 and 2011, during which time he owed but did not pay in excess of $50,000 in federal income tax and also owed in excess of $50,000 to United Bank, which rewrote the loan it made to Fattah on the condition that he make regular payments. Fattah neither paid taxes nor made the loan payments.

The purpose of Rule 1006 is to reduce the volume of documents introduced by permitting the evidence summarizing those documents into evidence. United States v. Georgiou, 2015 WL 241438 (3d Cir. 2015); United States v. Janati, 374 F.3d 263, 272-73 (4th Cir. 2004). It is appropriate and encouraged to allow the admission of summary charts "if they aid the jury in ascertaining the truth" after a consideration of other relevant factors including the complexity of the case, the number of witnesses, and the convenience of examining the underlying records in court. United States v. Loayza, 107 F.3d 257, 264 (4th Cir. 1997), (citing United States v. Johnson, 54 F.3d 11150, 1156 (4th Cir. 1995)); *see also* Fed. R. Evid. 1006. Rule 1006 permits the introduction of such summary charts where the voluminous writings underlying the chart cannot be easily examined in court. Georgiou, *supra*.

The charts and summaries are admissible because they are based on accurate, authentic, admissible information, and the underlying materials have been made available to the defendant. Fed. R. Evid. 1006; United States v. Pellulo, 964 F.2d 193, 204 n.9 (3d Cir. 1990); accord United States v. Leo, 941 F.2d 181, 193 (3d Cir. 1991) (lay opinion testimony properly admitted to help the jury understand and synthesize voluminous business records). Although the underlying records need not themselves be admitted into evidence, See United States v. Strissel, 920 F.2d

1162 (4th Cir. 1990), the government will move to admit the records which Forensic Accountant Michael examined in detail to create her summaries. *See e.g.* United States v. Paulino, 953 F.2d 739, 752-53 (6th Cir. 1991) superseded by statute, as explained in United States v. Caseslorente, 220 F.3d 227 (6th Cir. 2000) (allowing non-expert summary witness testimony to explain organizational chart reflecting various players and roles in the conspiracy, and another exhibit reflecting the cash generated from cocaine sales, under Rule 611(a), since they organized the jury's examination of testimony and documents already admitted into evidence, and since court gave a limiting instruction and defense had opportunity to cross-examine witness); United States v. Pree, 408 F.3d 855, 869 (7th Cir. 2005) ("It is well established that [t]he nature of a summary witness' (sic) testimony requires that he draw conclusions from the evidence presented at trial...When a summary witness simply testifies as to what the Government's evidence shows, he does not testify as an expert witness." (internal citations omitted)); United States v. Sabino, 274 F.3d 1053, 1067 (6th Cir. 2001), amended on other grounds by 307 F.3d 446, (6th Cir. 2002) (explaining that summary testimony is admissible in income tax prosecutions when the judge charges the jury as to the elements of

the crime, and where the summary is intended to aid the jury in organizing proof and is not inflammatory or prejudicially worded).

The government has provided defendant Fattah with the documents underlying the summary charts. The government has already provided the grand jury exhibits to Fattah, some of which are nearly identical to those which will be offered by Ms. Michael at trial. The final charts will be provided to Fattah before trial.

During its case-in-chief, the Government will call also call a summary witness with training in taxation. This witness, IRS Criminal Investigation Special Agent Revenue Michael Scheffer, will provide an analysis of the financial records introduced into evidence and explain the tax consequences of the Government's evidence. Special Agent Scheffer is also one of the cases agent familiar with the entire case against Fattah. Special Agent Scheffer will be present during the trial and will summarize the evidence regarding the amount of income tax due and owing by defendant Fattah, as well as the tax consequences related to Counts Fourteen through Eighteen of the Indictment.

The anticipated basis for Special Agent Scheffer's testimony will be the documents and oral testimony offered at trial, the summaries of voluminous evidence under Fed. R. Evid. 1006, as well as his experience and training in the field of taxation. His testimony will also have a basis in the Internal Revenue Code and its accompanying regulations, and will include his understanding of the relevant law and application of the facts as he understands them. This will include his understanding that embezzled funds constitute taxable income to the recipient. *See* James v. United States, 366 U.S. 213, 219-21 (1961); United States v. Renner, 648 F.3d 680 (8th Cir.2011) (Stolen funds are included in gross income for federal income tax purposes in the year in which they are misappropriated, where the embezzler receives an economic benefit, under the normal principles of income taxation.) United States v. Guidry, 199 F.3d 1150, 1157-58 (10th Cir. 1999). However, the Court, of course, will instruct the jury on what the law requires.

The government has provided the defense with a draft Revenue Agent Report created after consultation with and using income figures provided from his investigation by Agent

Scheffer.  The government reserves the right to amend these computations and summary schedules once the testimony is completed and he relevant documents have been admitted into evidence at trial.

## IV.   Self-Serving Hearsay evidence Offered by Fattah

As noted in the government's response to Fattah's motion to quash the indictment (Dkt. No. 34), it appears that Fattah may defend at trial in part by arguing that "259 Strategies" did have $140,000 in earnings during 2004.  Under this theory, Fattah may argue that Schedule C of the his 2004 personal income tax return, which showed that Fattah had $140,000 in revenue during 2004 while doing business as "259 Strategies," and which was used to persuade the banks to provide Fattah and Amato with lines of credit in 2005, was accurate.   It appears that Fattah may argue that whatever he or Amato "earned," during 2004, whether under the name "Fattagraphy," "259 Strategies," "CFJA," "American Royalty," or any other source for that matter, could be aggregated to justify Fattah's claim that he had $140,000 in revenue during 2004, as he told the banks.

To date, the government has received scant reciprocal discovery from Fattah.  But Fattah has provided several documents in an attempt to support this defense argument.   Among these documents produced by Fattah is an agreement for consulting services to be provided in 2004 by Matthew Amato to the House of Umoja, a community organization.  The agreement was accompanied by checks and invoices which appear to be evidence of work performed by Amato pursuant to the agreement.

Fattah also produced invoices from "CFJA" to Umoja in late 2004 and early 2005, along with checks totaling $20,000 to Fattah for "consulting fees" during 2004.  Other documents,

30

including an email from Queen Mother Falaka Fattah to defendant Fattah, suggest that Fattah was paid to create solicitations for a fundraising initiative for the House of Umoja. Fattah has also provided a $28,800 invoice from Fattahgraphy to Price King, with a corresponding payment check from Price King dated March 17, 2004. Conspicuously, none of these documents were provided to Fattah's 2004 tax return preparer.

Additionally, the government obtained during its investigation and provided to Fattah in discovery thousands of emails. Since Fattah has identified none in reciprocal discovery, it is unclear about whether Fattah may try to introduce any of his own emails, or other items of discovery, which may be self-serving and possibly run afoul of the hearsay rules.

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted in that statement. Fed. R. Evid. 801(c); *United States v. Love*, 767 F.2d 1052, 1063 (4th Cir. 1985). Rule 802 of the Federal Rules of Evidence generally proscribes the admission of such evidence. Fed. R. Evid. 802. The rules governing hearsay evidence are well settled and "rest[] on a number of conceptions that are basic to our entire law of evidence." 4 Charles Alan Wright et al., Federal Practice and Procedure § 6322. "[T]he major justification for excluding hearsay is that the declarant was not subject to the procedural safeguards that would eliminate the hearsay dangers," such as defects in the declarant's perception, memory, narration, and veracity. *Id.* § 6324.

Self-serving items of evidence may not fall under any exception to the hearsay rules. Fattah could not offer such statements as a party-opponent admission under Fed.R. Evid. 801(d)(2), because he would be offering his own statement rather than the statement of a party-

31

opponent. United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996); United States v.
Gossett, 877 F.2d 901, 906 (11th Cir. 1989) (noting that a co-defendant is not a party opponent of
a defendant for purposes of hearsay admission).   Similarly, any attempt by Fattah to introduce
self-serving statements by employing the residual hearsay exception contained in Fed.R. Evid.
807 would fail.   Rule 807(a)(1) requires that the "statement has equivalent circumstantial
guarantees of trustworthiness."

 Wilkerson is instructive.   In that case, the defendant alleged that the district court had
erred in prohibiting him from eliciting certain exculpatory statements he had made to an FBI
agent while explaining how he came to acquire certain evidence of a crime.   The court found that
the "evidentiary rules which properly govern[ed]" the admissibility of the exculpatory statements
were "contained within the hearsay rule and the exceptions thereto."   84 F.3d at 696.   The court
noted that, although the government could properly introduce statements made by the defendant
on direct examination due to the party-opponent admission exception, no such exception existed
for "self-serving, exculpatory statements made by a party which are being sought for admission
by that same party."   *Id.*   Because the exculpatory statements defendant wished to introduce were
"pure hearsay" and did not fall under any exception, the court found that that district court had
not abused its discretion in prohibiting their admission.   *Id.*

Under <u>Wilkerson</u>, any attempt by Fattah to admit self-serving exculpatory statements to prove that he did not possess the requisite intent or to minimize his own involvement in the crimes charged, should fail, as those hearsay statements would not fall under any stated exception to the hearsay rule.

Respectfully submitted,

ZANE MEMEGER
United States Attorney for the
Eastern District of Pennsylvania

s/Paul L. Gray
Paul L. Gray
Assistant United States Attorney
United States Attorney's Office
Eastern District of Pennsylvania

LESLIE CALDWELL
Assistant Attorney General
Criminal Division

s/Eric L. Gibson
Eric L. Gibson
Trial Attorney & Special Assistant U.S. Attorney
Public Integrity Section
Criminal Division

33

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Government's Trial

Memorandum has been served by electronic filing and email upon:

Chaka Fattah, Jr.
5783 Nassua Road
Philadelphia, PA 19131
cfattahjr@gmail.com

By: s/ Paul L. Gray
   Paul L. Gray
   Assistant United States Attorney

   Eric L. Gibson
   Trial Attorney and Special Assistant U.S. Attorney

Date: February 23, 2015

34



EXHIBIT B

FLOW OF FUNDS LINES OF CREDIT & CASH BACK OF SI. DEBTS

ATTACHMENT A



ATTACHMENT B

EXHIBIT F.1
CHAKA FATTAH JR'S AMERICAN EXPRESS CREDIT CARD -42003
USE OF FUNDS
AS REPORTED ON JULY 1, 2005 STATEMENT



CHAKA FATTAH JR'S AMERICAN EXPRESS EXPENSES -42003
as reported on July 1, 2005 statement

| USES OF FUNDS | AMOUNT | % |
|---|---|---|
| COMPUTERS/ELECTRONICS | $ 3,808 | 15.7% |
| CLOTHING/APPAREL | $ 3,797 | 15.6% |
| EDUCATION - DREXEL | $ 2,356 | 9.7% |
| OTHER | $ 2,354 | 9.7% |
| WALMART | $ 2,161 | 8.9% |
| RESTAURANTS/BARS | $ 1,893 | 7.8% |
| GAS STATIONS/CONVENIENCES STORES/PHARMACIES | $ 1,571 | 6.5% |
| TAXES | $ 1,327 | 5.5% |
| JEWELRY | $ 1,232 | 5.1% |
| BMW | $ 1,000 | 4.1% |
| TELEPHONE SERVICE | $ 946 | 3.9% |
| LIQUOR STORES | $ 604 | 2.5% |
| LEGAL FEES | $ 477 | 2.0% |
| ENTERTAINMENT | $ 462 | 1.9% |
| CAR RENTAL | $ 324 | 1.3% |
| TOTAL | $ 24,313 | 100.0% |

FLOW OF FUNDS FROM UNITED BANK LINE OF CREDIT ADVANCE #1



**ATTACHMENT C**

FLOW OF FUNDS FROM UNITED BANK LINE OF CREDIT ADVANCE #2



**Legend:**

- Line of Credit
- Casino
- Bank Account
- Check
- Cash
- Credit Card
- Car
- Confirmed Flow of Funds
- Unconfirmed Flow of Funds

$50,000
LINE OF CREDIT
LENDER: UNITED BANK
BORROWER: 259 STRATEGIES
DATE OF AGREEMENT: 4/22/2011
PURPOSE OF LOAN/WORKING CAPITAL
TO SUPPORT INCREASED BUSINESS

5/31/2011: $24,500

259 STRATEGIES
UNITED BANK
CHECKING ACCT -9912

5/31/2011: $20,000
5/31/2011: $875
6/6/2011: $400
6/6/2011: $125
6/3/2011: $604
6/4/2011: $947
6/3/2011: $200
6/2/2011: $477

CHAKA FATTAH JR
AUDI
CASH WITHDRAWAL AT CASINO
CFJR HSBC -9334
CASH
CHASE
CFJR NORDSTROM -6835

SUGARHOUSE CASINO

CFJR
CITIZENS BANK
CHECKING ACCT -8204

6/1/2011 $20,000
$20,000
$16,000
6/1/2011 $16,000

HARRAH'S CASINO

**ATTACHMENT D**